**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-15-01160-003-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Maria Magdalena Ruiz-Celaya, | |
| Defendant. | |

Defendant Maria Magdalena Ruiz-Celaya has filed a Motion for Reconsideration and Offer of Proof urging the Court to allow her to present a duress defense at trial. (Docs. 105 and 113.) The Court now considers this motion, the government's response (Doc. 114), and Ruiz-Celaya's reply (Doc. 118).

## I. FACTUAL BACKGROUND

The present motion stems from a criminal indictment charging Ruiz-Celaya with conspiring to export a firearm and possession of a firearm while present in the United States under a non-immigrant visa. (Doc. 1; Doc. 114 at 2.) The relevant events began on February 13, 2015, when Ruiz-Celaya's husband was arrested by U.S. authorities for various weapons violations. (Doc. 105 at 4.) Ruiz-Celaya maintains that at the time of her husband's arrest, her husband worked for a Mexican cartel and was tasked with obtaining a gun and transferring it to members of the cartel. (Doc. 105 at 4.) Ruiz-

Celaya further maintains that she herself had nothing to do with any of her husband's weapons trafficking prior to that point. (*Id.*; Doc. 113, ¶ 3.)

By Ruiz-Celaya's account, the day of her husband's arrest she was contacted by Ruben Parada-Ortega, a member of her husband's cartel.[1] (Doc. 105 at 4; Doc. 114 at 1.) Parada-Ortega and his associates initially did not have her contact information; to track her down they first showed up to her sister's home in Mexico and warned her sister that "things would get very ugly for her family" if they could not get in touch with Ruiz-Celaya. (Doc. 105 at 5; Doc. 113, ¶ 5.) This was apparently fruitful for them, because Parada-Ortega later called Ruiz-Celaya "demanding she produce either [a replacement] weapon or $20,000." (Doc. 105 at 4.) Ruiz-Celaya maintains she did not have $20,000. (Doc. 113, ¶ 3.) By her account, Ruiz-Celaya received threats of "harm to [herself], her children and/or her family in Mexico if she did not comply."[2] (Doc. 105 at 6.) In particular, Parada-Ortega brought up his visit to her family and his conversation with her sister "to highlight the people he would harm." (Doc. 105 at 5.) Ruiz-Celaya claims that the cartel generally was "known for violence and could be expected to carry out their threats." (Doc. 105 at 7.)

On top of all this, Parada-Ortega told Ruiz-Celaya she had a limited amount of time to come up with a replacement weapon, though Ruiz-Celaya's account leaves it unclear how much time she actually believed she had. At one point in her proffer, Ruiz-Celaya asserts she "was given an hour to find" a replacement weapon. (Doc. 113, ¶ 4; Doc. 105 at 4-5.) However, as the government points out (and Ruiz-Celaya does not dispute), it was fully three days after her husband's arrest that she finally purchased a .50

---

[1] According to Ruiz-Celaya, Parada-Ortega identified himself at the time only as "R" leaving her unaware of his true identity, though she did know right away that "R," whoever he was, also worked with her husband's cartel. (Doc. 105 at 7.)

[2] At oral argument on this motion, Ruiz-Celaya clarified that she was first called on February 13 shortly after her husband's arrest and told that the cartel knew about his arrest and would be in touch with her again. She maintains she was called again the next day, and during the course of this phone conversation was instructed that if she did not purchase a replacement weapon, her children would be hurt.

- 2 -

1  caliber rifle from a local gun seller, the transaction underlying her present charges.[3]
2  (Doc. 114 at 2.)  In any case there is no dispute that Ruiz-Celaya, with the help of her co-
3  defendants, made the weapon purchase on February 16, 2015.  (Doc. 114 at 1-2.)  Ruiz-
4  Celaya does not offer many details about what took place in the interim, but she does
5  contend that she was being closely monitored by Parada-Ortega, who, for at least some of
6  the time, "kept calling her so that she could update him of what was happening."[4]  (Doc.
7  105 at 5.)  Moreover, she maintains that because her family lived in Mexico, and because
8  she did not know the identity of Parada-Ortega at the time, she believed that contacting
9  authorities "would result in harm to her or her family."  (Doc. 105 at 8.)

After buying the weapon, Ruiz-Celaya received a call from a male who did not identify himself to her but was later identified by authorities as Miguel Angel Rodelo-Cota.  (Doc. 114 at 2.)  Rodelo-Cota, apparently also involved with the same cartel, gave Ruiz-Celaya specific instructions for delivering the weapon to him, which she did.  (Doc. 105 at 9; Doc. 114 at 2.)  In its motion to preclude, the government maintains that Ruiz-Celaya herself "stated that Rodelo-Cota had provided [Ruiz-Celaya] the money to purchase the rifle."  (Doc. 114 at 2.)  Ruiz-Celaya, however, contends in no uncertain terms "that she did not receive any money for buying the gun," and insists "[h]er only motive for committing this crime was an immediate fear of death or serious injury to herself or family."[5]  (Doc. 105 at 9.)

On at least two occasions over the next six days, Ruiz-Celaya spoke with federal

---

[3] The government acknowledges that the one-hour deadline Ruiz-Celaya was given may have been imposed on her at some point on the day of the weapon purchase itself—though Ruiz-Celaya's account leaves it unclear whether this is the case.  (*See* Doc. 114 at 6; Doc. 105 at 4.)

[4] At oral argument, Ruiz-Celaya noted that shortly after her husband's arrest, federal agents showed up at her house to investigate his alleged crimes—after which Parada-Ortega contacted her letting her know he was aware the authorities had come to her house.  By Ruiz-Celaya's account, this and other similar events suggested to her that she was being closely monitored during this time.

[5] Ruiz-Celaya clarified at oral argument that just prior to the gun buy, she was in fact instructed to meet an unidentified individual who gave her cash to purchase the weapon.  However, she contends that it was only enough for the purchase and that she did not receive any additional payment for completing it.

agents about the events that took place.  Ruiz-Celaya contends that "Agent Reports dated February 16 and February 22, 2015, show that Mrs. Celaya-Ruiz [sic] immediately assisted in the investigation and told agents about what had happened."  (Doc. 105 at 8.) Ruiz-Celaya does not mention who initiated either of these encounters.  The government, however, contends that agents conducted a non-custodial interview with her on February 20, 2015, in which she allegedly stated that Rodelo-Cota gave her money to make the gun purchase.  (Doc. 114 at 2.)  The government also notes that Ruiz-Celaya took part in another interview with law enforcement agents on February 22, 2015, which the government points out is the basis for Ruiz-Celaya's duress defense.  (*Id.*)

In her initial proffer of a duress defense, Ruiz-Celaya included as an exhibit a copy of an ICE Report of Investigation dated March 4, 2015, which notes two interviews with her conducted by ICE agents, one on February 20, 2015, and one on February 22, 2015. (Doc. 85-1.)  The report memorializes scant details of the February 20 interview in two short paragraphs, noting only that Ruiz-Celaya told agents she had been instructed by someone identifying himself as "R" to buy the .50 caliber rifle.  (*Id.* at 3.)  The report reveals she contacted authorities the next day, February 21, saying she was scared that this unknown individual kept contacting her.  (*Id.*)  The report makes no mention of Rodelo-Cota or whether Ruiz-Celaya was given any money to buy the gun.  The report provides greater detail for the February 22 interview, including a lengthy written conversation between Ruiz-Celaya and "R" via WhatsApp.  (*Id.* at 3-6.)  Ruiz-Celaya told the agents she did not feel personally threatened by him, but that she was worried he would harm her family in Mexico since he knew where they lived.  (*Id.* at 3.)  The report states that after the interview, agents suggested Ruiz-Celaya move to a different location for a few days, but that Ruiz-Celaya insisted on remaining at her house.  (*Id.* at 6.)

**II. LEGAL STANDARDS**

Duress is a common-law defense "that allows a jury to find that the defendant's conduct is excused, even though the government has carried its burden of proof" at trial.

1  *United States v. Chi Tong Kuok*, 671 F.3d 931, 947 (9th Cir. 2012). To be able to raise
2  duress as a defense at trial at all, the defendant must first make a prima facie showing of
3  duress in a pre-trial offer of proof. *United States v. Vasquez-Landaver*, 527 F.3d 798,
4  802 (9th Cir. 2008). This is to ensure the defense is relevant and does not merely confuse
5  the jury; "the constitutional right to testify . . . does not authorize a defendant to present
6  irrelevant testimony." *United States v. Moreno*, 102 F.3d 994, 999 (9th Cir. 1996).

7  Duress requires a showing of three elements: "(1) an immediate threat of death or
8  serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3)
9  lack of a reasonable opportunity to escape the threatened harm." *Vasquez-Landaver*, 527
10 F.3d at 802 (quoting *Moreno*, 102 F.3d at 997). The government here only disputes
11 elements (1) and (3). (Doc. 114 at 4.)

### III. ANALYSIS
#### A. Duress Elements
##### 1. Immediacy

The first element of duress, immediacy, "requires that there be some evidence that the threat of injury was present, immediate, or impending." *United States v. Contento-Pachon*, 723 F.2d 691, 694 (9th Cir. 1984). The threat must be "such that the defendant's persecutors 'figuratively held a gun to his head' (or to his family's heads) compelling the defendant to commit the illegal action." *Vasquez-Landaver*, 527 F.3d at 802 (quoting *United States v. Shyrock*, 342 F.3d 948, 988 (9th Cir. 2003)). "[T]o be immediate, a threat must be specific: 'A veiled threat of future unspecified harm will not satisfy this requirement.'" *Chi Tong Kuok*, 671 F.3d at 948 (quoting *Contento-Pachon*, 723 F.2d at 694). *Compare Shyrock*, 342 F.3d at 987 (rejecting immediacy element where persecutors told defendant he had "thirty days to straighten out and regularly attend [organized crime group's] meetings, or else they would physically assault him"), *with Contento-Pachon*, 723 F.2d at 694 (finding triable issue as to immediacy where defendant was being closely monitored and an experienced criminal obtained specific

1  details about the defendant's family and personal life such that "the consequences [of
2  noncompliance] would have been immediate and harsh").

3  Ruiz-Celaya has asserted that Parada-Ortega threatened harm to her family if he
4  could not get in touch with her and that "[Parada-Ortega] and his associates asked [Ruiz-
5  Celaya] to conduct the deal in Phoenix by use of these threats." (Doc. 105 at 5.) Ruiz-
6  Celaya consistently maintains that Parada-Ortega threatened to harm her family if she did
7  not comply in the weapon purchase as instructed in the specified timeframe.

8  The government, however, contests these assertions on two grounds. The
9  government first contends that any purported threats made to her were non-specific, the
10 closest thing being Parada-Ortega's statement to Ruiz-Celaya's sister that "things would
11 get ugly for her family" if he could not get in touch with Ruiz-Celaya, a statement that
12 itself was made only to Ruiz-Celaya's sister. (Doc. 114 at 5.) The relevant legal
13 question, however, is whether Ruiz-Celaya's rendition of the facts provides "some
14 evidence" that she faced an immediate threat. *See Contento-Pachon*, 723 F.2d at 694.
15 The Court is satisfied it does. Ruiz-Celaya maintains not only that Parada-Ortega made
16 this threat to her sister, but also that when he subsequently spoke to Ruiz-Celaya, he
17 ominously mentioned his visit to her family and extended these same threats to Ruiz-
18 Celaya herself. Her contentions may or may not be true, but resolving disputed factual
19 questions goes beyond the scope of the present motion.

20 Second, and somewhat related, the government raises doubts about how Ruiz-
21 Celaya characterizes certain key facts. The government points specifically to one
22 statement, Ruiz-Celaya's assertion that "[Parada-Ortega] mentioned this visit to my
23 family's home in Mexico and his conversation with [my sister] to highlight the people he
24 would harm." (Doc. 114 at 5.) On the government's view, while Ruiz-Celaya states this
25 "in a way to convey that it was a threat, it is unclear whether there was an actual threat or
26 whether [Parada-Ortega] merely mentioned he had spoken to the family about her . . . "
27 (*Id.*) The government raises a legitimate question as to how best to interpret Parada-
28 Ortega's statement, but this again does not detract from Ruiz-Celaya's prima facie case.

1    By Ruiz-Celaya's account, Parada-Ortega's mere mention of the visit to her family
2    communicated a threat of harm to them if she failed to provide him with a gun. A
3    persecutor's ability to communicate concrete details about the defendant's family can—
4    and often does—constitute an immediate threat, even where the threat is not explicitly
5    articulated. *See, e.g.*, *Chi Tong Kuok*, 671 F.3d at 948 (finding prima facie case of
6    immediacy where persecutor "knew [the defendant's] family's movements and other
7    intimate details that demonstrated that his family was regularly monitored"); *Contento-*
8    *Pachon*, 723 F.2d at 694 (determining immediacy was a triable issue of fact where
9    persecutor "had gone to the trouble to discover that [the defendant] was married, that he
10   had a child, the names of his wife and child, and the location of his residence"). Ruiz-
11   Celaya's interpretation suffices to establish a prima facie immediate threat. If the
12   government interprets Parada-Ortega's statements differently, it can offer its own
13   interpretation in front of a jury at trial.

14   The government, however, points to *United States v. Houston*, in which the Ninth
15   Circuit held that immediacy was not present where the alleged persecutor, who had
16   ordered the defendants to carry out several prison gang murders, testified at trial "that he
17   would have killed [the defendants] if they hadn't participated" in the murders as
18   instructed. 648 F.3d 806, 816 (9th Cir. 2011). The court characterized the persecutor's
19   testimony as "at most a threat of future harm," and emphasized that the defendants twice
20   refused his orders, yet did not in either case face immediate repercussions. *Id.*
21   Accordingly the court held that such "[t]hreats of non-imminent, future harm do not
22   support a duress instruction." *Id.* The *Houston* court, however, omitted a key factual
23   detail from the trial court's findings below: while the persecutor and both defendants
24   testified that the persecutor would have killed the defendants for refusing to assist, the
25   trial court found "there is no evidence that [the persecutor] ever threatened either
26   Defendant in any way before the killings. Defendants instead rely on a generalized
27   threat, arguing that it was well known that the [prison gang] would kill those who refused
28   to comply with its orders." *United States v. Slocum*, 486 F. Supp. 2d 1104, 1115 (C.D.

- 7 -

Cal. 2007), *aff'd sub nom. Houston*, 648 F.3d at 820.

*Houston* is not applicable here for two reasons. First, it is unclear whether Ruiz-Celaya failed to comply with any of Parada-Ortega's instructions. If she did and experienced no harm (to either herself or her family), Ruiz-Celaya would indeed struggle to show immediacy. But unlike in *Houston*, there is no allegation by either side that Parada-Ortega or any of his associates balked at any opportunities to make good on their threats. Ruiz-Celaya carried out her instructions as given and has reasonably alleged that the threats against her were both credible and continuous. Second, Ruiz-Celaya maintains that Parada-Ortega made a direct threat to her specifically. Whereas the defendants in *Houston* identified no more than a general (if "well-known") threat applicable to all non-compliant gang members, Ruiz-Celaya has pointed to specific threats made to her and her family in particular. While the government disputes the extent to which these threats may have motivated her actions, this does not stand in the way of Ruiz-Celaya making a prima facie case of immediacy. A jury can hear the evidence and determine which version of the facts is most credible.

### 2. Escapability

To make out the escapability element of a duress defense, a defendant must show that he or she lacked a reasonable opportunity to escape the threatened harm. *Contento-Pachon*, 723 F.2d at 694. "[T]he inability to seek help from the local police is a relevant factor in assessing the opportunity to escape." *Chi Tong Kuok*, 671 F.3d at 949. Likewise, "the possibility of packing up and moving out of the dangerous environment, abandoning one's work and displacing one's entire family, does not necessarily present a reasonable opportunity for escape." *Id.* The relevant inquiry is "whether [the defendant's] belief was objectively reasonable . . . taking into account her particular circumstances." *United States v. Nwoye*, 663 F.3d 460, 464 (D.C. Cir. 2011) (citation omitted).

Ruiz-Celaya argues not only that she faced a short turnaround time in which to

obtain the gun, but also that Parada-Ortega kept a close watch on her by, among other things, contacting her repeatedly.  Her rendition of events, if true, would suffice to show she could not have fled or otherwise withdrawn from the gun purchase conspiracy without risking harm to her family.  Moreover, Ruiz-Celaya contends that because of entrenched corruption in Mexico, she did not trust Mexican authorities to protect her family there, and that she did not believe she could obtain protection from U.S. authorities even for herself because she did not know Parada-Ortega's true identity.  Under her circumstances, living in the United States with her family in Mexico, it was a reasonable belief that neither U.S. nor Mexican authorities could have guaranteed the protection of her family, especially given that she did not know Parada-Ortega's identity at that point.  There may of course be reason to doubt Ruiz-Celaya's underlying claims.  But the facts she alleges provide enough evidence to make out a prima facie case that she lacked a reasonable opportunity to escape.

The government nonetheless insists that the escapability prong of duress contains an additional requirement, namely that "in these circumstances, a defendant must present some evidence indicating that she 'took the opportunity to escape the threatened harm by submitting to authorities at the first reasonable opportunity.'"  (Doc. 114 at 6 (quoting *Contento-Pachon*, 723 F.2d at 695).)  The very case the government cites, however, notes that submission to authorities "seems to be required only in prison escape cases." *Contento-Pachon*, 723 F.2d at 694.  Subsequent cases have confirmed this proposition more decisively.  *See Chi Tong Kuok*, 671 F.3d at 949 ("[W]e have not held that a defendant must surrender to authorities after reaching a place of safety, except in prison escape cases."); *United States v. Beltran-Rios*, 878 F.2d 1208, 1213-14 (9th Cir. 1989) (noting that the submission requirement "has independent significance only in prison escape cases"); *United States v. Karr*, 742 F.2d 493, 497 (9th Cir. 1984) (same); *United States v. Jennell*, 749 F.2d 1302, 1305 (9th Cir. 1984) (same).

But even if the government's articulated rule were correct, by Ruiz-Celaya's account she did not have a reasonable opportunity to submit to authorities between the

time she was recruited and the time she purchased the gun. A credible threat remained against her family in Mexico if she did not complete the gun purchase for whatever reason. By her account (and corroborated at least in part by the ICE agents' reports), Ruiz-Celaya first came into contact with authorities shortly after the gun purchase—possibly the same day—and when she did, she cooperated with federal agents and explained to them that she faced threats from an unknown member of her husband's cartel. This is enough for a prima facie case of escapability.

The government also points to an additional case, *Moreno*, for the proposition that "a defendant has a reasonable opportunity to escape the threatened harm by surrendering to authorities when confronted at a point of inspection even where the defendant asserts that they are being watched by the people who threatened them and that threats have been made against their family." (Doc. 114 at 7 (citing *Moreno*, 102 F.3d at 997-98).) But *Moreno* is quite different from this case. In *Moreno* the court indeed rejected the defendant's proffer of duress after the defendant asserted he attempted to smuggle drugs to Hawaii only because a persecutor threatened him and his family. *Moreno*, 102 F.3d at 997-98. But the defendant there was approached by his persecutor fully three weeks prior to the date of the crime, and was not monitored or followed at all until two weeks had passed, at which time his persecutor articulated specific threats to the defendant and his family if he did not smuggle the drugs. *Id.* at 996. When confronted by law enforcement at the airport, the defendant did not submit but rather attempted to flee—and even proceeded to kick a police officer in the head multiple times in the process. *Id.* at 998-99.

Contrast that, however, with this case, where the window of time is not three weeks but at most three days—during which Ruiz-Celaya maintains she was being closely monitored. Furthermore, the government does not dispute Ruiz-Celaya's assertion that she fully cooperated with authorities after being apprehended. (*See* Doc. 105 at 8.) Again, there might be reasons to doubt her rendition of events. But the only question here is whether she has asserted enough evidence to make out a prima facie case

that she lacked a reasonable opportunity to escape.  The Court determines she has, the government's arguments notwithstanding.

### B.  FRE 401 and 403

Finally, the government urges that, in light of its position that Ruiz-Celaya cannot make out a prima facie case, her duress defense should be deemed irrelevant and excluded under the Federal Rules of Evidence.  The government first points to Rule 401 and argues that Ruiz-Celaya's duress defense should be excluded on grounds of relevance.  For the reasons discussed above, however, the Court finds that Ruiz-Celaya can make out a prima facie case of duress, and thus the defense is relevant to the charges against her.

The government goes on, however, and argues that even if the evidence of duress has "some minor probative value," it should still be excluded under Rule 403.  (Doc. 114 at 7.)  Under Rule 403, a court may exclude even relevant evidence if the "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The government raises concerns about a duress defense confusing the issues, misleading the jury, and posing unfair prejudice.

Because she has made a prima facie case of duress, evidence of Ruiz-Celaya's defense is both relevant and highly probative as to her culpability for the crimes with which she was charged.  There is of course some risk she could present particular items of evidence that are irrelevant or misleading.  Permission to raise a duress defense certainly does not give her carte blanche to bring in otherwise inadmissible evidence.  The government may still challenge—and the Court will duly consider—the admissibility of each piece of evidence Ruiz-Celaya seeks to introduce.  Because the Court can (and will) exclude specific evidence as is appropriate, permitting Ruiz-Celaya to raise a duress defense at trial presents no general risk of confusing the issues, misleading the jury, or

unfairly prejudicing the government. Accordingly, her defense will not be categorically excluded under Rule 403.

IT IS THEREFORE ORDERED that Defendant's Motion to Reconsider (Doc. 105) is granted.

IT IS FURTHER ORDERED that Plaintiff's Motion to Preclude Duress Defense (Doc. 87) is denied.

Dated this 30th day of September, 2016.

*Neil V. Wake*
Senior United States District Judge